# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| VELVEETA A. JENKINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:12-cv-1519-WTL-DML |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of the Social Security ) | |
| Administration,[1] ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Velveeta[2] A. Jenkins requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Supplemental Social Security Income ("SSI") under the Social Security Act (the "Act"). The Court now rules as follows.

## I. PROCEDURAL HISTORY

Jenkins filed an application for SSI on May 17, 2010, alleging disability beginning December 1, 2001, due to diabetes, neuropathy in her hands and feet, degenerative joint disease in her knees, chronic back pain, and involuntary head movements. Jenkins' application was initially denied on August 20, 2010, and again upon reconsideration on December 6, 2010. Thereafter, Jenkins requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on August 15, 2011, before ALJ Michael Harris in Valparaiso, Indiana. During

---

[1]Carolyn W. Colvin became Acting Commissioner of the Social Security Administration after this case was filed. She is therefore substituted as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

[2]It appears from the administrative record that Ms. Jenkins' first name is spelled "Velvetta"; however, the documents filed in this court use the spelling "Velveeta."

the hearing, Richard T. Fisher testified as a vocational expert. On August 18, 2011, the ALJ issued a decision denying Jenkins' application for benefits. The Appeals Council upheld the ALJ's decision and denied a request for review on August 21, 2012. This action for judicial review ensued.

## II.     EVIDENCE OF RECORD

The relevant medical evidence of record follows.

### A. Sister Maura Brannick Clinic

For many years, Jenkins has treated with various physicians at the Sister Maura Brannick Clinic in South Bend, Indiana.

On June 16, 2002, Jenkins visited the Clinic complaining of "pseudoseizure activity." Specifically, her head would involuntarily shake from side to side five to six times a day and she suffered from headaches. She followed up with the Neurology Department at Indiana University; however, no cause could be determined.

Throughout 2003 and 2004, Jenkins regularly complained of left hip pain, left shoulder pain, headaches, and continued shaking episodes. On January 26, 2004, an x-ray of her left hip revealed only "mild to moderate degenerative changes and mild to moderate changes of protrusion acetabulae" Tr. at 513.

On January 13, 2005, Jenkins began complaining of fatigue, pain in her left knee, and pain on the left side of her back. On January 27, 2005, an x-ray of her left knee indicated "degenerative changes." By April 1, 2005, Jenkins began experiencing pain in both her knees. She had an x-ray of her right knee taken on May 19, 2005, which revealed "degenerative osteoarthritic changes." One of Jenkins' treating physicians, Dr. Leslie Bodnar, recommended weight loss and ibuprofen, as opposed to cortisone injections, to treat the pain.

On June 21, 2005, Jenkins returned to the Clinic after she bent over and experienced a sharp pain in her left side. The pain continued, and on July 14, 2005, an x-ray of the spine revealed "mild L4-5 intervertebral disc space narrowing." *Id.* at 478. Also "a small osteophyte [was] suggested off the inferior posterior aspect of L4." *Id.*

On September 22, 2005, Jenkins reported little relief from her knee pain. As a result, she received pain injections.

On May 11, 2006, Jenkins complained of pain in her knees and hip, blurry vision, fatigue, and headaches. Dr. Bradley Scott suggested a sleep study, an eye exam, and additional injections to treat the pain.

On June 8, 2006, Jenkins had a follow-up appointment with Dr. Scott regarding her diabetes, blood sugar levels, and involuntary movements. Dr. Scott prescribed Celexa to treat the stress and anxiety related involuntary movements and instructed Jenkins to begin dieting and exercising.

On October 9, 2006, Jenkins had a CT scan and x-rays taken of her lumbar spine. The tests indicated "mild intervertebral disc space narrowing at the L4-5 level[, and m]ild anterior spondylolytic changes of the lower thoracic spine [were] also noted." *Id.* at 468.

During an appointment on January 3, 2007, Dr. Daniel Scherb noted that Jenkins suffered from hypertension, non-insulin dependent diabetes, hypertriglyceridemia, and morbid obesity. He recommended that Jenkins begin exercising. He also instructed her to follow up with Dr. Scott regarding her blood pressure.

On May 10, 2007, Jenkins met with Dr. Scott regarding her diabetes and pain in her left wrist. An x-ray of her wrist showed a small erosion in the ulnar styloid, but was otherwise unremarkable.

On August 9, 2007, Jenkins complained of pain in her hips. The doctor also noted that a recent eye exam was unremarkable from a diabetic standpoint

On September 13, 2007, Jenkins reported additional twitching episodes that increased with stress.

The following month, on October 11, 2007, Jenkins complained of left arm numbness and tingling. An electromyography (EMG) test taken on December 3, 2007, indicated "dysfunction of the left median nerve at the wrist." *Id.* at 462. According to the doctor, "[t]his finding would be consistent with a mildly to moderately severe left carpal tunnel syndrome." *Id.*

On December 27, 2007, Jenkins complained of continued knee pain. However, her doctor reported that an x-ray revealed some degenerative changes but nothing acute.

Jenkins continued to experience pain in her back, knees, left hand, and left shoulder. On May 2, 2008, an x-ray of her spine indicated "mild degenerative changes" *Id.* at 460. Additionally, on July 15, 2008, an x-ray of her left hand revealed that "the ulnar styloid [was] mildly blunted but not frankly eroded." *Id.* at 458. During this time, the doctor noted that Jenkins' blood sugar was under control.

On September 11, 2008, Jenkins reported feeling more depressed, but admitted that she had stopped taking her medication. She also complained of left hip pain. With regard to her hip pain, Dr. Scott reported that "despite [a] relatively negative work-up, [he would] send her to Dr. Ribaudo for further evaluation and treatment." *Id.* at 212.

Several months later, on December 11, 2007, Jenkins complained that she was experiencing pain radiating down the left side of her leg. The doctor reported that an x-ray showed some degenerative discs, that Jenkins had stopped taking Prozac, and that she was having a lot of family issues.

4

On January 22, 2009, an MRI of the lumbar spine revealed "mild subluxations at L4-5 and L5-S1, likely on a degenerative basis. No convincing evidence of spondylolysis. . . . [and] mild degenerative disc changes at L4-5." *Id.* at 454.

On April 16, 2009, Jenkins reported that she continued to experience a great deal of pain. The doctor also reported that Jenkins' blood sugars were controlled and that Jenkins was "pondering disability" due to her head shaking episodes.

On June 20, 2009, Jenkins had additional x-rays taken of her knees. The x-rays indicated "mild degenerative changes involving the medial compartment as well as patellfemoral space. [Additionally, c]alcifications [were] seen superior to the patella which may be calcifications within the musculotendinous structure." *Id.* at 451.

On July 9, 2009, Jenkins' doctor reported that she was doing reasonably well except for the pain in her back and knees. Several months later, on October 8, 2009, Jenkins' doctor reported again that he was doing reasonably well and that her blood sugars were controlled.

On January 14, 2009, Jenkins reported that her back was still bothering her.

On April 15, 2010, Jenkins complained that she was stressed and fatigued.

On December 16, 2010, one of Jenkins treating physicians, Dr. Ribaudo, completed a form entitled "Medical Assessment of Ability to do Work-Related Activities" for Jenkins' attorney. On the form, he noted that Jenkins could sit for a total of eight hours in an eight-hour day, but that she could only sit for a total of one hour at a time. He further opined that Jenkins could only stand and walk for thirty minutes in an eight-hour workday due to her severe obesity, lumbar spondylosis, osteoarthritis, and diabetic polyneuropathy. He reported that Jenkins could only lift and carry up to 10 pounds occasionally. She could not perform simple grasping, pushing

and pulling of arm controls, or fine manipulation with either hand and could not operate foot controls with either foot. He also reported that Jenkins was "not curable." *Id.* at 560.

On January 13, 2011, Jenkins' doctor reported that she was "overall doing well, feeling okay." *Id.* at 575. Again, on June 9, 2011, her doctor indicated that Jenkins was "doing well" and she had "no new complains, concerns, or problems." *Id.* at 567.

### B. Adult Mental Status Evaluation

On July 17, 2010, Jenkins underwent an adult mental status evaluation with Patrick Utz, Ph.D. At that time, Jenkins reported that she took Albuterol, Glucotrol, Tramadol, Levoxyl, Accupril, Toperal, Prozac, Hydrodocone, and Metformin to treat her various ailments. Dr. Utz also reported that Jenkins "dresses[,] grooms[,] and bathes, fully taking care of herself and her sister on full-time basis."[3] *Id.* at 530. She also "cooks, cleans, does laundry, and shops." *Id.* Dr. Utz ultimately diagnosed Jenkins with "adjustment reaction with depressed mood." *Id.* at 531. A state-reviewing physician affirmed Dr. Utz's findings.

### C. Consultative Physical Examination

On July 26, 2010, Jenkins underwent a consultative physical examination with Dr. Thomas Barbour. Jenkins reported that she was unable to work "due to chronic low back pain and bilateral knee pain." *Id.* at 533. Dr. Barbour opined as follows:

1. This patient has a longstanding history of low back pain and knee pain which continues to interfere with all daily activities. . . . Prognosis for further improvement is poor. Followup is highly recommended.

2. Patient has a longstanding history of involuntary movement of the head which may intermittently interfere with activities. Prognosis is guarded. Followup is highly recommended.

---

[3]Jenkins' sister suffers from cerebral palsy and lives with Jenkins. Jenkins is responsible for cleaning her sister, taking her to the restroom, and assisting with other functions that her sister is unable to perform.

3. This patient has a history of depression. Overall, she has done well but intermittently this can be a problem. Prognosis is good. Followup is highly recommended.

4. She has a history of diabetes mellitus and hypertension, but these problems by themselves do not seem to interfere with her day-to-day activities. Prognosis is good. Followup is highly recommended.

5. She has a history of chronic dyspnea which interferes with activities on an intermittent basis. Prognosis is guarded. Followup is highly recommended.

*Id.* at 534.

### III. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. §

416.920(a)(4)(iii). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

On review, the ALJ's findings of fact are conclusive and must be upheld by the court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while "[he] is not required to address every piece of evidence or testimony," he must "provide some glimpse into [his] reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1177.

## IV.    THE ALJ'S DECISION

At step one, the ALJ found that Jenkins had not engaged in substantial gainful activity since May 17, 2010, her application date. At step two, the ALJ concluded that Jenkins suffered from the following severe impairments: osteoarthritis, hypertension, diabetes, and obesity. At step three, the ALJ determined that Jenkins' severe impairments did not meet or medically equal a listed impairment. At step four, the ALJ concluded that Jenkins had the residual functional capacity ("RFC") to perform "the full range of light work as defined in 20 CFR 416.967(b)." Tr. at 17. Given this RFC, and taking into account Jenkins' age, education, and work experience, the ALJ determined at step five that Jenkins could perform jobs existing in significant numbers in

the national economy. Accordingly, the ALJ concluded that Jenkins was not disabled as defined by the Act from May 17, 2010, through the date of his decision.

## V.     DISCUSSION

Jenkins advances several objections to the ALJ's decision; each is addressed below.

### A.  Weight Given to Treating Physician

Jenkins argues that the ALJ committed reversible error in failing to give the opinion of one of her treating physicians, Dr. Stephen Ribaudo, controlling weight. With regard to the opinions expressed by Dr. Ribaudo on the form prepared by Jenkins' counsel, the ALJ gave "little weight to the opinion . . . , as it [was] inconsistent with the record." *Id.* at 19-20. In this regard, the ALJ reasoned as follows:

> [T]he claimant's total restriction from common elements such as humidity and noise would seem to preclude the claimant from even everyday living. Moreover, Dr. Ribaudo's restriction of no bending or twisting would seem to preclude the claimant from even sitting, which Dr. Ribaudo opined she would be able to do for 8 hours a day.[4] In addition, the claimant's record shows that she has had only minimal clinical findings, including only mild degenerative changes in her knees, left hip, and back. . . . The consultative examiner, Dr. Barbour further found that claimant had full range of motion in her extremities, no diminished grip strength, and normal muscle strength in her extremities. . . . The claimant's blood sugar levels have also been consistently in the normal range once she started taking medication. . . . In this respect, Dr. Ribaudo's opinion appears to be a mere accommodation on behalf of the claimant and her disability claims or at least, primarily based on the claimant's subjective complaints.

*Id.* at 20. The Court agrees that the ALJ's decision requires further analysis on this subject.

> A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010). An ALJ who rejects a treating physician's opinion must provide a sound explanation for the rejection. 20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007).

---

[4]The Court does not believe that "bending and twisting" is, as a factual matter, synonymous with sitting.  If the ALJ believed that Dr. Ribaudo's opinion was internally inconsistent, seeking clarification of what the doctor meant would have been appropriate.

9

*Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). Moreover, "'[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011) (quoting *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

In evaluating Dr. Ribaudo's opinion, the ALJ compared the restrictions noted by Dr. Ribaudo with the medical evidence of record, particularly the results of the various x-rays, MRIs, and CT scans and Dr. Barbour's consultative physical examination. The ALJ, however, did not discuss the length, nature, and extent of the treatment relationship Jenkins had with Dr. Ribaudo, the frequency of examination, or Dr. Ribaudo's specialty. As a result, this matter must be remanded to the Commissioner. On remand, the ALJ must consider each of the above-mentioned topics.

### B. Combination of Impairments

Jenkins further argues that the ALJ failed to consider the effect her morbid obesity had on her osteoarthritis and resulting pain. An ALJ is required to "consider the aggregate effect of [a claimant's] entire constellation of ailments–including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (noting that "a competent evaluation of [a claimant's] application depends on the total effect of all his medical problems").

With regard to a claimant's obesity, SSR 02-1p requires an ALJ to consider obesity's effects when evaluating disability and in determining whether a claimant meets or equals Listings related to the musculoskeletal, respiratory, and cardiovascular body systems. ALJs are further reminded that "the combined effects of obesity with other impairments can be greater

than the effects of each of the impairments considered separately." The Court finds that the ALJ appropriately considered Jenkins' obesity. In fact, the ALJ noted in his decision that Jenkins' "obesity was considered in relation to the musculoskeletal, respiratory, and cardiovascular body systems listings as required by [SSR 02-1p]." Tr. at 16. Jenkins does not argue, nor does she submit any evidence to show that Jenkins meets one of the relevant Listings. Furthermore, the ALJ acknowledged Jenkins' degenerative changes and the pain she experiences. It does not appear from the medical records that the pain was exacerbated by her obesity, such that the ALJ was specifically required to discuss Jenkins' obesity in relation to the degenerative changes in his RFC analysis.

As such, the ALJ did not err in failing to consider the effect Jenkins' morbid obesity had on her osteoarthritis.

## C. Credibility Determination

Finally, Jenkins argues that the ALJ's credibility determination was based on an improper assumption regarding the degree of Jenkins' sister's disability. The ALJ concluded that Jenkins' "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" the ALJ's RFC assessment.[5] Tr. at 17. In reaching this determination, the ALJ reasoned, in part, that Jenkins "cares for her 47-year old sister who has special needs, including cleaning up after her and taking her to the bathroom," *id.* at 18, and was her sister's "full-time caretaker." *Id.* at 19. In this regard, Jenkins argues that the

---

[5]The Seventh Circuit has "repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record." *Moore v. Colvin*, ___ F.3d ___, 2014 WL 763223 (7th Cir. 2014) (citing *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012)). However, "the use of such boilerplate language will not automatically discredit the ALJ's ultimate conclusion if the ALJ otherwise identifies information that justifies the credibility determination." *Id.*

ALJ did not ask Jenkins during the hearing "whether she had to lift her sister or perform any heavy physical activities in the care of her sister." Jenkins' Br. at 12. Jenkins also maintains that "[c]aring for her sister is not very different than caring for a child." *Id.* (citing *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir. 2005) (noting that "taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not")).

The Court agrees with Jenkins that just as there is a difference between maintaining employment and caring for an infant, there is a difference between Jenkins' ability to "clean her [sister] and take her to the bathroom and things like that," Tr. at 38-39, and the ability to maintain a job. Compounding the problem, in rejecting Jenkins' allegation of disabling pain, the ALJ also noted that Jenkins testified that she "did some of the household chores, including sweeping and washing dishes" and suggested that this testimony conflicted with Jenkins' statement during her consultative exam that "even light housework was very difficult." This ignores the fact that when testifying about her ability to perform daily activities, Jenkins explained that she does household chores "in spurts" and that it is painful to do them: "Like if I'm sweeping, I can sometimes sit and sweep. And washing dishes, I just do a little bit here and there and then sit down for a while and then you know, go back to them." Tr. at 39. The Court fails to see the inconsistency relied upon by the ALJ and fails to see how the activities testified to by Jenkins demonstrates that her allegation of pain is not credible. Indeed, the Seventh Circuit has "'cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home.'" *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (quoting *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)). When considering daily activities as evidence of a claimant's RFC, an ALJ must consider not only the nature of the activities, but their duration and impact on the claimant. *Id.*

(finding that ALJ erred in emphasizing claimant's ability to perform household chores but ignoring that he performed them with great difficulty, for short periods of time, and was exhausted afterward); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). It does not appear that the ALJ did so here. Upon remand, the ALJ should reconsider his credibility determination.

## VI. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this Entry.

SO ORDERED: 03/06/2014

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.